[See Case No. 3,115.]

---

## Case No. 10,421.

### The OCONTO.

[5 Biss. 460.] [1]

District Court, E. D. Wisconsin. Oct., 1873.[2]

STEAM-TUG INSPECTION.

1. A steam-tug employed in towing rafts and lumber on a river exclusively within the state, is not a common carrier, nor liable to seizure for not having been inspected.

2. A seizure must be alleged in order to give the court jurisdiction.

In admiralty. This libel of information was brought under the act of congress, approved February 23, 1871 (16 Stat. 440), entitled "An act to provide for the better security of life on board of vessels propelled in whole or in part by steam, and for other purposes," to recover of this steam-tug a penalty of five hundred dollars for not having been inspected.

It is charged that the steam-tug at divers times betwen the 25th day of May, 1871, and the 25th day of May, 1872, was used and employed in the business of towing boats, rafts, and vessels on the navigable waters of the United States, to wit, from the city and port of Oconto, to and about the mouth of the Oconto river, and to sun-

---

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

2 [Affirmed in Case No. 9,330.]

---

dry ports and places to and upon Green Bay in this district.

The answer of respondents denies the said allegation, and alleges that the tug is a small steamer, and between the times stated in the information, or so much of the time as the Oconto river was not obstructed with ice, she was used and employed in towing rafts of lumber on the Oconto river, and over the bar to vessels, on to which the lumber was to be loaded, and in towing vessels in and about the mouth of the Oconto river for the convenience of loading or unloading the same. It is further alleged that the Oconto river is not a navigable water of the United States within the meaning and intent of the act of congress, and not, in fact, navigable for vessels employed in trade between two or more states; nor is said river susceptible of commerce over which trade or travel is or may be conducted in the customary mode of trade or travel by water; and that the tug was used exclusively in the said business at the mouth of the river, as vessels employed in commerce could not enter the river.

The respondents further allege in their answer that from the advice of counsel they did not believe that the tug so employed in said river came within the provisions, or object, or intent of the act of congress, but to avoid difficulties they had at several times within the said dates applied to the inspectors of hulls and boilers to inspect the tug, but for reasons stated, it was not done.

Levi Hubbell, U. S. Dist. Atty., for the Government.

Finches, Lynde & Miller, for claimants, cited the following: U. S. v. The Seneca [Case No. 16,251]; Act 1871 (16 Stat. 44) §§ 1, 41, 47, 58, 59; The Daniel Ball, 10 Wall. [77 U. S.] 557; The Farragut [Case No. 4,677]; The Bright Star [Id. 1,880]; Navigation Co. v. Dwyer, 29 Tex. 376; Veazie v. Moor, 14 How. [55 U. S.] 568; Elizabethport & N. Y. Ferry Co. v. U. S. [Case No. 4,362]; U. S. v. The Echo [Id. 15,021]; Conway v. Taylor's Ex'r, 1 Black [66 U. S.] 603.

MILLER, District Judge. By the proofs it appears that the Oconto river has its rise and flows into Green Bay within this state, and that boats not drawing over three feet of water may in the season of navigation pass up the river for a distance of about two miles to the small city of Oconto. The steam-tug Oconto was of about 40 tons burden, and from May 25th, 1871, to May 25th, 1872, she was employed in towing rafts and scows out of the river to vessels, and towing scows up to the town. The lumber was floated down the river and tied up at its mouth, and then the tug took the lumber in tow with a long line and towed it over the bar to the vessels lying in the bay, about three-fourths of a mile. After the rafts are towed to the side of the vessels the tug has

nothing more to do with them. The vessels when loaded run to their said ports of destination on Lake Michigan. There is no harbor at the mouth of the Oconto river, and if the vessels could not pass over the bar into the river, they anchored in the bay in from 12 to 20 feet of water.

The boiler of the tug burst from the hydraulic test applied for the purpose of determining its strength and safety. The tug had no safety-valve, no water-gauge nor pump, no life preserver nor signal lights. For want of these things, and because of the bursting of the boiler, a certificate was refused. On the 23d of September, 1872, a certificate was given.

The act of 1871 [16 Stat. 440], under which this libel of information is brought, creates a full and well-digested system for the inspection, equipment and management of vessels propelled in whole or in part by steam, for the better security of life on board of such vessels. In the first section of the act it is provided that if any vessel, propelled in whole or in part by steam, shall be navigated without complying with the terms of the act, the owner or owners thereof shall forfeit and pay to the United States the sum of five hundred dollars for such offense, one-half for the use of the informer, and for which sum the steamboat or vessel so engaged shall be liable, and may be seized and proceeded against by way of libel. This is the authority for bringing this libel of information.

Section 59 of the act provides "that the hull and boiler, or boilers of every tug-boat, towing-boat and freight-boat shall be inspected under the provisions of this act." In terms the tug Oconto is within the provisions of the act. But when we consider the constitutional power of congress to regulate commerce with foreign powers and among the different states, was it the intention of congress to require the inspection of a mere tow-boat employed in towing rafts and barges on waters within the state exclusively? The tug is clearly not within the scope of the act as indicated by its title, to provide for the better security of life on board. It had no means or arrangements for the accommodation of passengers. It does not appear that any arrangements were on board even for the accommodation or lodging of the men engaged in its navigation. The tug was not a common carrier of either passengers or freight. It discharged a mere towing duty for vessels employed in trade with this and other states.

The act of June 8, 1864 (13 Stat. 120) § 4, required the inspection of the hull and boiler of every vessel propelled in whole or in part by steam, and engaged as a ferry-boat or tug in towing boats or canal-boat, in all cases where under the laws of the United States such vessel may be engaged in the commerce with foreign nations or among the several states. Under this act a steam-tug employed in towing on the Connecticut river exclusively within the state of Connecticut, was not a vessel engaged in commerce and was not within the provisions of this act. The Farragut [Case No. 4,677].

Over domestic commerce within states congress has no control, although it may be carried on by means of the navigable rivers of the United States, and congress in its legislation steadily kept this in view, and a steamboat engaged in carrying passengers from one small town to others on a navigable river within one state is not required to be inspected. The Bright Star [Case No. 1,880]; Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713.

From an examination of Act Feb. 28, 1871, section by section, and of all its directions and provisions in connection with the consideration of the constitutional grant of power to congress, the presumption is that the section requiring the inspection of hulls and boilers is not to be construed to embrace this tug. It is neither alleged in the libel nor proven that the tug had been seized. The libel of information will therefore be dismissed.

[On appeal to the circuit court the decree of this court was affirmed. Case No. 9,330.]

NOTE. "Coasting vessels, steamboats, canal boatmen and those on rivers, and ferry men are all common carriers, if their general occupation is to carry for the public." 1 Pars. Shipp. & Adm. 246, 247, note 1, cases there collected.

For a full discussion of what are navigable waters of the United States, and the relative right of control over them by congress and the states, consult The Daniel Ball, 10 Wall. [77 U. S.] 557; The Montello, 11 Wall. [78 U. S.] 411; City of Chicago v. McGinn, 51 Ill. 266–272.

As to the allegation of seizure, see The May [Case No. 9,329]. This case and The May [Id. 9,330] were on appeal to the circuit court affirmed by Judge Drummond in November, 1874.